**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CHINA BEDS DIRECT, LLC, and HEALTHCARE GROUP (HONG KONG) COMPANY, LIMITED,** | ) ) ) | |
| *Plaintiffs,* | ) ) | **Case No: 1:21-cv-** |
| **v.** | ) ) | Filed: |
| **BENJAMIN FOLKINS and UPWARD MOBILITY, INC.,** | ) ) ) | |
| *Defendants.* | ) ) | |

## COMPLAINT

Plaintiffs, China Beds Direct, LLC ("China Beds") and Healthcare Group (Hong Kong) Company, Limited ("Healthcare Group") by their attorneys, bring this Complaint for declaratory and injunctive relief and allege the following:

## BACKGROUND

1. The Defendants, Benjamin Folkins ("Folkins") and Upward Mobility, Inc. ("Upward Mobility" or "BedBoss") in a pending state court proceeding are seeking to enforce what the federal antitrust laws have long forbidden as per se illegal: namely, market and allocation agreements between competitors.

2. On or around 2008, Folkins created a company, Upward Mobility (which does business under the trade name BedBoss), which sold mattress and bedding products. Later, at some point in 2011, Folkins entered into an arrangement with Plaintiffs to sell mattresses in the United States. To limit competition with China Beds and his company, Upward Mobility, Folkins insisted that Plaintiff Healthcare Group and its parent company Healthcare Co. Ltd. not compete in many distribution channels and for many categories of customers. Basically, under

this agreement Upward Mobility could compete for any customer, Folkins could steer China Beds to certain distribution channels, and Folkins could contractually prevent Healthcare and Healthcare Group from competing for these customers in these markets. While these customer and market allocation provisions would benefit Folkins and his company Upward Mobility, they would stifle Healthcare and Healthcare Group from competing in the United States. As these customer and market allocation provisions were not necessary for China Beds to succeed, and there was no redeeming business justifications for them, Healthcare and Healthcare Group continued to compete. In response, Folkins sought to make these customer and market allocation provisions even stricter in his efforts to favor Upward Mobility. When Healthcare Group continued to compete, Folkins withdrew from China Beds. Rather than compete against Healthcare Group, Folkins and Upward Mobility elected to bring suit in the Chancery Court of Hamilton County, Tennessee, seeking compensatory and punitive damages from the harm they allegedly suffered from Healthcare Group's competition.

3. In their state court complaint, Folkins and Upward Mobility allege that the Plaintiffs' breach of these per se illegal market and customer allocation agreements caused them harm.

4. Healthcare Group sought to raise as an affirmative defense in the state court proceeding that these contractual provisions, which Defendants are seeking to enforce, are contrary to public policy, null, void, illegal and unenforceable as they would violate both federal and state antitrust law. Healthcare Group argued that the Defendants could not pursue a breach of contract claim when enforcing these provisions would actually compel an antitrust violation under the Sherman Act.

5. Even though the United States Supreme Court has long held that these types of

contractual provisions are patently illegal, the state court declined to permit the Plaintiffs from amending their answer to raise these affirmative defenses. Consequently, the state court proceeding will be tried before a jury in August 2021, without the availability of the illegality defense of the antitrust laws. The net result would be Defendants' compelling a federal antitrust violation, thereby harming Plaintiffs, mattress customers, and competition generally.

6. Consequently, Plaintiffs bring this action under the Sherman Act, 15 U.S.C.A. §1 and the Declaratory Judgment Act 28 U.S.C.§§2201-2202 for injunctive and declaratory relief. and contend that the market and customer allocation provisions that form the basis of the majority of the Defendants' claims in the state court proceeding are contrary to public policy, null, void, illegal, and unenforceable as they would violate Section 1 of the Sherman Act as well as state antitrust law.

7. Since enforcing these provisions would compel a federal antitrust violation, Plaintiffs also seek to permanently enjoin the Defendants from enforcing these customer and market allocation provisions, and from using these or any other provision in the Distribution and Operating Agreements to interfere with Plaintiffs' efforts to sell mattresses in the United States. Consequently, Plaintiffs seek injunctive relief to bar the continued enforcement of the challenged customer and market allocations provisions contained in the Distribution Agreement and the Operating Agreements because their enforcement would result in unlawful market allocation between actual or potential competitors in restraint of trade and the tampering of prices, which the federal courts have acknowledged are the supreme evil of the federal antitrust laws.

## PARTIES

8. Plaintiff, China Beds, is a Tennessee limited liability company with its principal

place of business in Hamilton County, Tennessee. At all times relevant hereto, China Beds is engaged in the distribution and sale of mattresses in interstate commerce.

9. Plaintiff, Healthcare Group (Hong Kong) Company Ltd. ("Healthcare Group") is a foreign corporation organized and existing under and by virtue of the laws of Hong Kong and duly authorized to do business in Tennessee. At all times relevant herein, Healthcare Group has engaged in the manufacture, distribution, and sale of mattresses in interstate and international commerce.

10. Defendant, Benjamin Folkins ("Folkins") is a resident of the State of Tennessee and can be served at 10179 Lee Highway, Ooltewah, Tennessee. At all times relevant herein, Folkins was President of Upward Mobility and acted within the scope of his employment as such.

11. Defendant Upward Mobility, Inc. ("Upward Mobility") is a Tennessee corporation with its principal place of business at 6065 East Brainerd Road, Chattanooga, Tennessee. Folkins started Upward Mobility to sell, among other things, mattresses, pillows, and linen directly to individual customers, retailers, and in other distribution channels in interstate commerce.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. §§1331, 1337, 2201 and 2202. Federal district courts have subject matter jurisdiction over actions seeking a declaration as to the legality of contracts under the federal antitrust laws, as long as the request for relief appears on the face of the complaint. Plaintiffs here seek the declaratory relief that the contractual provisions that Folkins and Upward Mobility are seeking to enforce in the state court proceeding violate the federal antitrust law and thus are void and unenforceable.

13. Moreover, this Court has subject matter jurisdiction under 15 U.S.C. §26. Plaintiffs request an injunction preventing Defendants from enforcing the challenged contractual provisions against them, and 15 U.S.C. §26 expressly authorizes private parties to seek injunctive relief "against threatened loss or damage by violation of the antitrust laws."

14. This Court has personal jurisdiction over Defendants by virtue of them either residing or doing business in Tennessee.

15. Venue is proper in this judicial district under 28 U.S.C. §1391 and 15 U.S.C. §22.

16. There is an actual substantial controversy between the parties having adverse legal interests, and the dispute is actually concrete, not hypothetical, or abstract. Defendants, in their complaint filed in the Chancery Court of Hamilton County, Tennessee, *Folkins, et al.v. Healthcare Co. et al.,* Civ. Action No. 17-0175 (the "state court proceeding") seek, among other things, to enforce several contractual provisions, and recover damages for Plaintiffs' breaching these provisions. (A copy of the Defendants' Verified Second Amended Complaint is attached hereto Exhibit A.) Healthcare Group sought to assert as an affirmative defense to the complaint that the agreements relied upon were illegal under the antitrust laws, but the motion was denied. An actual and justiciable controversy, therefore, exists between the parties regarding the enforceability of the Distribution Agreement and the Operating Agreements in whole or in part. As the state court has refused to address the legality of these provisions under federal or state antitrust law, and instead has denied the ability of Healthcare Group to assert that defense, the dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

## THE FACTS

17. In 2008, Folkins began operating Upward Mobility, a mattress seller and distribution business located in Chattanooga, Tennessee, and doing business under the trade name BedBoss.

18. Healthcare Group is, and was, a distributor of bedding products, including mattresses.

19. Prior to 2011 Upward Mobility purchased unbranded mattresses from Healthcare Company, Ltd., a manufacturer of mattresses and bedding products and the parent company of Healthcare Group. Upward Mobility sold some or all of those mattresses purchased from Healthcare Company, Ltd. under the BedBoss label either directly to, among others, individual customers in the United States, hotels and the hospitality sector, and retailers. Upward Mobility, however, asserted that its specialty market was the market of sellers with 20 or fewer retail outlets.

20. Prior to 2011, Healthcare Company Ltd. manufactured bedding products under the trademark and tradename MLILY outside the United States and was very successful.

21. In 2011 Folkins traveled to China to meet the president of Healthcare Company, Ltd., James Ni, to persuade Ni to sell his MLILY product in the United States through him.

22. The conversations which Folkins conducted with Ni were successful, and those conversations led to the formation of a business in the United States to sell MLILY mattresses.

23. As a result of the agreement, China Beds was formed on March 1, 2011, the members of which were Folkins and Healthcare Group, which was formed at or about the same time as the distribution arm of Healthcare Company, Ltd.

24. On October 14, 2011, China Beds was converted from a corporation to a Tennessee limited liability company, the members of which were Folkins and Healthcare Group.

25. On or about December 27, 2011, Folkins and Healthcare Group entered

into an Agreement (the "2011 Agreement") for the operation of China Beds. A copy of the

Agreement is attached to this Complaint as Exhibit B. The 2011 Agreement was followed by

agreements in 2014 and 2016, along with a Distribution Agreement in 2016. Copies of all

subsequent agreements are attached to this Complaint as Exhibits C, D and E.

26. Under the 2011 Agreement Folkins was named President and Chief

Operating Officer, and James Ni was named Vice President and Chief Executive Officer of

China Beds.

27. While holding the position of President and Chief Operating Officer of

China Beds, Folkins was also a majority stockholder and Chief Executive Officer of Upward

Mobility, which continued to sell mattresses in competition with Plaintiff China Beds and

Healthcare Group. To restrict that competition, Folkins, as alleged below, turn to customer and

market allocation agreements.

**28.** China Beds commenced doing business in 2012 and began to sell

bedding products in the United States to various retail outlets.

**29.** Between 2012 and 2014, China Beds purchased its bedding products

from Healthcare Company Ltd. through Healthcare Group, which also sold mattresses to Upward

Mobility.

**30.** Between 2012 and 2014 the business of China Beds grew and was

successful.

31. As part of the arrangements among Folkins, Upward Mobility and

Healthcare Group, Folkins and Upward Mobility extracted the initial Operating Agreements and

the Distributor Agreement, under the terms of which Healthcare Group was not permitted to sell

mattress product in competition with China Beds to customers of China Beds which had 20 or

fewer outlets. This channel of "small retailers/distributors with no more than 20 storefronts" was the same channel in which Upward Mobility primarily competed with its BedBoss brand of mattresses and bedding.

32. Even though Upward Mobility and China Beds were direct competitors, Folkins in the state court proceeding alleged that he shared Upward Mobility employees with China Beds. Folkins also alleged that he directed numerous Upward Mobility customers to purchase from rival China Beds, rather than his own company.

33. Between 2011 and 2016, the Operating Agreement was revised on at least two separate occasions as a result of sales by Healthcare Group alleged to be violations of the agreements not to compete. The final versions of those anticompetitive agreements are found in the 2016 agreements, attached to the Chancery Court complaint.

34. The Operating Agreement of China Beds of 2016 also contained, for the first time in any agreement among the parties, a provision for the buy-out of a member on withdrawal.

### The Terms of the Operating and Distribution Agreements

35. In 2013 and 2014, Folkins discovered that Healthcare Group was selling bedding products to companies in the United States that owned fewer than 20 stores, the same market that his company Upward Mobility targeted with its BedBoss label mattresses and bedding products

36. Folkins had a clear conflict of interest. He was, on the one hand, a minority owner of China Beds, and, on the other hand, he competed against China Beds with his own business, Upward Mobility.

37. To prevent Healthcare Group from competing against Folkins' own company,

Upward Mobility, and foreclose Healthcare Group's entry into other segments where Upward Mobility competed (such as mattress and pillow purchasers in the hospitality sector), Folkins used the Customer and Market Allocation Provisions (as defined later in paragraph 49) to carve up the customers and markets where China Beds, Upward Mobility, and Healthcare Group could sell. In seeking to preclude Healthcare Group from selling not only in the market segment where both China Beds and Upward Mobility sold (namely, in the market of "retailers/distributors with no more than 20 storefronts"), but in the other channels where Upward Mobility sold such as customers in the hospitality sector, Folkins would profit from the reduction in competition.

38. So, Folkins argued that Healthcare Group (the majority owner of China Beds) could not compete in the specialized market of retailers/distributors servicing 20 or fewer storefronts, which he claimed China Beds was to serve (even though that was the same channel in which Upward Mobility competed).

39. As a result of Folkins' insistence, in 2014, Folkins and Healthcare Group entered into a revised operating agreement that provided that Healthcare Group would not sell below the price at which China Beds sold product and would not add customers beyond the customers who did business with Healthcare Group before January 2012; moreover, China Beds with Folkins as the President, would control to whom Healthcare Group could sell its mattresses.

40. Healthcare Group could also not compete for any new United States customers beyond those it had as of January 2012.

41. The 2014 Operating Agreement contains the following customer and market allocation provisions:

> 10. Partner Responsibilities. Individual responsibilities are as follows:
> Healthcare Group (Hong Kong) Co., Limited (James Zhangge Ni):
>
> • * * *

- Continue to Set competitive prices and provide the Finest quality Healthcare offers.
  (Healthcare will not sell other customers below the price set for China Beds Direct, its own company)
  A. Since the onset of the partnership, it has been agreed upon that Healthcare Factory will not add new wholesale distribution customers to compete with MLILY's style of business in the U.S. beyond the customers who did business with Healthcare prior to January 2012.
  B. Furthermore, it is determined that retail chain stores with less than 20 locations require the assistance of a quickly available warehouse inventory that CBD offers.
  Methods of business comprised by description A above will be decided by Members of China Beds Direct and its best interest, while allowing only agreed-upon exceptions in writing by President and Vice President of CBD.
  The customary OEM Business of Healthcare factory in the U.S., For example and not limited to, selling large sleep retail chains (with locations in excess of 20), Big Box for Retailers, TV, or Internet customers, shall not be willfully interfered upon by China Beds Direct
  Current competitor distribution companies (For example Healthcare brand or Sherwood with Dockter, Inc. or EZ REST or PRIMO) that were doing business with Healthcare before this partnership commenced in January 2012 shall not be interfered upon by China Beds Direct.

42. Because of further complaints by Folkins, in October 2014, a list of "allowable customers" was prepared to whom Healthcare Group could sell only with the approval of both Folkins and Ni. In short, Folkins could veto any customer that Healthcare Group sought, reserving the customer to himself or China Beds, whichever was more profitable for him.

### THE 2016 DISTRIBUTION AGREEMENT

43. As a result of a public offering by Healthcare Company, Ltd., a new Operating Agreement was signed in 2016, as well as a Distribution Agreement.

44. The 2016 Distribution Agreement provided that China Beds would be Healthcare Group's exclusive dealer in the United States for "retail chain stores with 20 or fewer locations."

45. The 2016 Distribution Agreement contained even more restrictive market and

customer allocation provisions. For example,

    a.  Healthcare Group could not independently compete for customers in the Hospitality Industry for at least 5 years, a segment in which Upward Mobility competed.

    b.  Healthcare Group could not sell mattresses and pillows to any US customer not identified on Exhibits 2 and 3 created by the parties.

    c.  Healthcare Group could sell to customers on Exhibit 3 but only if Healthcare Group did not compete with distributors that service retailers that have 20 or fewer stores or locations, which would include Upward Mobility and China Beds.

46. The 2016 Distribution Agreement between China Beds and Healthcare Group contains the following customer and market allocation provisions:

6.1 During the term of this Agreement and for 12 months after termination, Manufacturer will not make or solicit sales of mattress or pillow product to any customer or potential customer of Distributor identified to Provider in writing. The provisions of the preceding sentence do not apply to customers or potential customers Manufacturer identified before the Effective Date and listed on Exhibits 2 and 3, and shall also not include big-box stores, large chain stores with more than 20 retail locations, and consumer direct sales through the TV or Internet. Violation of this section shall be a material breach of the Agreement. Exhibits 2 and 3 shall be maintained by the Parties, and updated as necessary, but not less than once per quarter. Exhibit 3 shall list all United States customers of Manufacturer.

6.3 Manufacturer may make sales to customers on Exhibit 3 so long as such sales do not compete with Distributor's specialty business of selling to customers that have 20 or fewer stores or locations, or distributors who service the same. If Manufacturer makes sales to customers listed on Exhibit 3 which are later found to compete with Distributors specialty business, Distributor shall be entitled to a royalty of 5% on the gross sales of competing mattress and pillow product sales. . . .

6.4 Manufacturer may not sell competing mattress and pillow products produced by Manufacturer to any customer not listed on Exhibit 3. If Manufacturer sells Products to any new customers or distributors other than Distributor in the United States that have 20 or fewer stores or locations, or distributors who service the same, Distributor shall be entitled to a royalty of 5% on all gross sales are competing mattress and pillow products made to any customer or distributor located in the United States not listed specifically on Exhibit 3. Violation of this section shall be a material breach of the Agreement.

6.5 Hospitality Industry. Manufacturer agrees not to sell Products to any hospitality industry customers in the Territories other than through this Distributor until January 1, 2021. . . .
8.1 The prices charged by the Manufacturer to the Distributor as set forth in Exhibit 1 shall be set for each contact calendar year on January 1 of said calendar year. Manufacturer shall give notice to Distributor no later than November 1 for any price change to be instituted the following calendar year. Prices shall only be subject to change during a calendar year, with at least four weeks' notice, if the manufacturer can show a 5% fluctuation in the currency exchange rate, or a 5% or greater increase in the cost of raw materials for the Products.

.

47. Any doubt about Folkins' anticompetitive design is eliminated when considering how Folkins sought to prevent Healthcare Group from competing for any new customers beyond those Folkins had approved and which Healthcare Group already had secured as a customer as of January 2012. This airtight market allocation agreement again benefited his company, as it ensured that Healthcare could not compete for any of Upward Mobility's current customers or any new customers that Upward Mobility might seek to acquire in other market segments.

48. These clauses went beyond protecting China Beds, as Healthcare Group could not solicit *any* new customer in the United States (not simply those in the market of "retailers' distributors with no more than 20 storefronts"), thus making it easier for Folkins' BedBoss to expand in that business without the threat of Healthcare Group.

49. Consequently, the 2014 Operating Agreement's Customer and Market Allocation

Provisions and the 2016 Distribution Agreement's Customer and Market Allocation Provisions (collectively the Customer and Market Allocation Provisions) were not necessary and did not protect any legitimate business interests of China Beds.

50. Nothing in the 2014 Operating Agreement or the 2016 Distribution Agreement offers a pro-competitive business justification for these Customer and Market Allocation Provisions.

51. Nor does the Defendants' complaint in the state court proceeding offer any business rationale for these Customer and Market Allocation Provisions.

52. Instead, the Customer and Market Allocation Provisions would primarily benefit Upward Mobility, which was not a party to the 2014 Operating Agreement or the 2016 Distribution Agreement. The Customer and Market Allocation Provisions sought to prevent Healthcare Group from competing for any of Upward Mobility's current or prospective customers, including retailers with 20 or fewer stores or locations and customers in the hospitality industry.

53. Moreover, Folkins, as President of China Beds and the owner of Upward Mobility, could set the prices for both rivals in the specialized market of retailers/distributors servicing 20 or fewer storefronts. Under the 2016 Distribution Agreement, Healthcare Group had to keep its prices to China Beds "at least 4% lower" than its prices for similar products for any other US customers.

54. By setting BedBoss mattress prices at or below China Beds' prices, for example, Folkins through the provisions in the 2016 Distribution Agreement could prevent Healthcare Group from gaining sales in the United States in any trade channel by charging less than the prices Folkins fixed for his company, which would be less than what Healthcare Group could charge under the 2016 Distribution Agreement.

55. Thus, the Customer and Market Allocation Provisions, by dictating to whom Healthcare Group could sell and not sell, and limiting what prices it could sell its mattresses made it easier for Folkins to secure business for his own company, Upward Mobility. Folkins sought to profit from the Customer and Market Allocation Provisions, at the expense of competition, customers, China Beds, and Healthcare Group.

56. The customer and market allocation agreements could not only unreasonably restrain competition between China Beds and Healthcare Group, but amount to naked restraint of trade between Healthcare Group and Upward Mobility.

57. In excluding Healthcare Group from the "20-storefront-or-less market," Folkins could more easily raise the prices of China Beds' and BedBoss' mattresses. If the smaller retailers purchased the BedBoss mattress, Folkins would gain 100% of the profits. If the retailer purchased at a higher price the China Beds mattresses, Folkins would gain 45% of the profits. So, in keeping his rival Healthcare Group out of this 20-storefront-or-less segment, Folkins stood to profit from this per se illegal horizontal restraint.

58. Healthcare Group would suffer, as it was limited to only 55% of the profits of those China Bed mattresses sold in the 20-storefront-or-less segment and would lose all the potential revenue from selling in segments where Upward Mobility sold, but China Beds did not. Absent the agreements China Beds and Healthcare Group would be able to engage in ordinary competition on the merits with Upward Mobility and would actively compete for the sale of mattresses and mattress products in the United States and elsewhere.

59. In late 2016, Folkins discovered that Healthcare Group was competing against China

Beds and his company Upward Mobility. After repeatedly telling Healthcare Group to stop competing, Folkins gave notice that he was withdrawing in late December, 2016, from China Beds, with an effective date of September 30, 2017.

60. Effective February 7, 2017, Folkins resigned as a member of China Beds solely because of the breach referred to in the preceding paragraph and ceased to be a member of China Beds.

61. Folkins' attorney in a letter, dated December 8, 2016, referenced Healthcare Group selling to direct competitors of China Beds and its "refusal to commit to honoring the Distribution Agreement."

62. On or about March 17, 2017, Folkins caused the lawsuit to be commenced in the Chancery Court of Hamilton County, Tennessee, on behalf of himself, Upward Mobility and China Beds and against Healthcare Group, among others, for, inter alia, a breach of the Operating Agreements and Distribution Agreement. In that complaint Folkins alleged that damages were suffered by him, China Beds and Upward Mobility as a result of the breach of the agreements and in particular the Customer and Market Allocation Provisions.

63. In the Complaint, Folkins brings seven counts on behalf of himself individually and on behalf of Upward Mobility and China Beds (which he left in the previous month). Four of the seven counts arise from the Customer and Market Allocation Provisions. Specifically, in Count I of the Second Amended Complaint, Folkins alleges that breaches of the 2011 Operating Agreement, 2014 Agreement and the 2016 Operating Agreement, by among other things, selling goods to potential customers of China Beds and/or retailers or distributors in the 20 storefront or less market resulted in damages to him personally as well as to China Beds.

64. In Count Two of the Complaint, Folkins, individually and on behalf of Upward

Mobility/BedBoss, brings a claim of unjust enrichment, which is based in part on "[i]ntroduction and transfer of customers and distributors" from Upward Mobility to competitor China Beds and the harm Folkins and Upward Mobility suffered from the increasing competition when Healthcare Group directly sold some of its MLILIY and non—MLILY products in the United States.

65. In Count Three of the Complaint, Folkins alleges that he was a third-party beneficiary of the 2016 Distribution Agreement, and thus is seeking to recover damages from, among other things, Healthcare Group selling goods to competitors of China Beds, potential customers of China Beds, and/or retailers or distributors in the 20-storefronts-or-less market. Folkins also alleges that "Healthcare did not update the approved customer list as required and/or omitted customers to whom it was making sales, all in violation of the Distribution Agreement."

66. It also appears that the competitor Upward Mobility is also seeking damages in Count Three of the Complaint when two customers ceased doing business with BedBoss as a result of Healthcare Group's and Ni's "lies, disruption, and interference with BedBoss and/or by competing with China Beds."

67. Consequently, Defendants, Folkins and Upward Mobility, a direct competitor of China Beds and Healthcare Group, in the state court proceeding, are seeking to enforce these Customer and Market Allocation Provisions that the federal antitrust laws have long condemned as per se illegal.

68. Agreements that violate federal antitrust laws are null, void and unenforceable. The effect of the Sherman Act of 1890 was to render such contracts not only void and unenforceable but unlawful in an affirmative or positive sense. It is also per se illegal for competitors to allocate or transfer customers among themselves. Thus, Defendants cannot

recover damages for illegally allocating Upward Mobility customers to China Beds, even if assuming arguendo, China Beds might have benefited from this illegal conduct.

69. On March 31, 2021, Healthcare Group in the state court proceeding moved to amend its answer to raise the affirmative defense of illegality under the Sherman Act.

70. On May 5, 2021, 2021, the trial court in the state court proceeding refused to grant the motion to amend, which effectively means that the state court will allow Defendants to seek to enforce these Customer and Market Allocation Provisions in violation of the Sherman Act.

71. Thus, in the state court proceedings, Defendants are currently seeking, among other things, specific performance of the Operating Agreement (which may entail enforcing these Customer and Market Allocation Provisions and compel an antitrust violation under the Sherman Act and state law), compensatory damages for Plaintiffs' breaching these Customer and Market Allocation Provisions, punitive damages, and attorney's fees for seeking to enforce these per se illegal provisions.

72. In addition, Folkins is seeking to enforce the provisions of the Operating Agreement for the purchase of his interest in the limited liability company as a result of his withdrawal and to recover in excess of $3 million. Because his withdrawal is based upon the alleged violation of the Customer and Market Allocation Provisions, the withdrawal is void, since the amount he is seeking as his buy-out is based upon the income of China Beds, which is based, in whole or in part, upon the Customer and Market Allocation Provisions.

<u>COUNT ONE</u>

(Declaratory Judgment Pursuant to 28 U.S.C. §§2201-2202:
Customer and Market Allocation Provisions Are Unenforceable under the Sherman Act)

73. Plaintiffs incorporate paragraphs 1 through 72 above.

74. Plaintiffs bring this action under the Declaratory Judgment Act, 28 U.S.C.

§§2201-2202, and seek a declaration that the Customer and Market Allocations Provisions in the Operating Agreements and the Distribution Agreement, as well as in any other agreement between Folkins and Plaintiffs, are per se violations under Section 1 of the Sherman Act and, thus, invalid and unenforceable.

75. A present, genuine, and justiciable controversy exists between Plaintiffs and Defendants regarding the validity and enforceability of the Customer and Market Allocation Provisions.

76. Enforcement of the Customer and Market Allocation Provisions would impose an undue hardship on Plaintiffs.

77. Enforcement of these provisions would also be injurious to the public as an unreasonable restraint of trade.

78. Plaintiffs are entitled to a judgment declaring:

    a.  the Customer and Market Allocation Provisions of the Operating and the Distribution Agreement, which Defendants are now seeking to enforce in the state court proceeding, are contrary to public policy, null, void, illegal and unenforceable as they would violate Section 1 of the Sherman Act and the laws of Tennessee, namely T.C.A. §§47-25-101 and 47-25-102;

    b.  that Defendants cannot pursue a breach of contract claim, when enforcing these Customer and Market Allocation Provisions would actually compel an antitrust violation under the Sherman Act and Tennessee state law;

    c.  Defendants' transferring and allocating customers and distributors between Upward Mobility and China Beds and any other illegal services Upward Mobility allegedly provided to China Beds for which Defendants now seek to recover in the state proceeding are not recoverable as Defendants' actions are contrary to public policy and illegal under Section 1 of the Sherman Act and the laws of Tennessee, namely T.C.A. §§47-25-101 and 47-25-102;

    d.  that the "Non-compete, Non-solicitation" provisions of the Distribution Agreement, as defined in the Second Amended Complaint, which Defendants seek to enforce and Count 3 of their Second Amended Complaint, are contrary to public policy, null, void, illegal and unenforceable as they would violate the laws of Tennessee, namely T.C.A. §§47-25-101, and Section 1 of the Sherman

Act and that Defendants cannot pursue a breach of contract claim, when enforcing these provisions would actually compel an antitrust violation under the Sherman Act and state law;

e.  any other causes of action or claims for damages or relief by Defendants including any alleged breach of any promises, allege contractual provisions or fiduciary duties that arise from any promise to allocate markets or customers, fix prices, or otherwise violate the laws of Tennessee, including T.C.A. §§47-25-101 and 47-25-102, or any other federal law, are contrary to public policy and are thus null, void and unenforceable.

f.  any other cause of action under the Operating Agreement which is based upon or a reason for the invocation of the provisions of the agreement for the purchase of a membership interest of a withdrawing member which is based in whole or in part upon the Customer and Market Allocation Provisions is contrary to public policy and are thus null, void and unenforceable..

## COUNT TWO

(Enjoining under 15 U.S.C. §26, the Enforcement of Contracts in Restraint of that Violate Section 1 of the Sherman Act)

79. Plaintiffs incorporate Paragraphs 1 through 72 above.

80. The Customer and Market Allocation Provisions in the Operating Agreements in the Distribution Agreement in allocating territories and fixing prices are naked restraints of trade, and, therefore, constitute per se violations of the Sherman Act, 15 U.S.C. §1.

81. Defendants cannot pursue a breach of contract, undue enrichment, or breach of fiduciary duty claim, when enforcing the Customer and Market Allocation Provisions would actually compel an antitrust violation under the Sherman Act and state law.

82. In addition, both competition as a whole and as to Plaintiffs individually will suffer injury if the agreements referred to above are enforced, either retrospectively as a breach of contract, or prospectively. The result would be to subject Plaintiffs to damages for breach of illegal contractual provisions, and hamper Plaintiffs' possibility to compete, thereby causing diminished choices of and higher prices for consumers if enforced prospectively.

83. Plaintiffs have no adequate remedy at law in the absence of injunctive relief.

84. Accordingly, pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, Plaintiffs are entitled to an order enjoining the enforcement of the Operating Agreements referred to above and the Distribution Agreement.

COUNT THREE

(Declaratory Judgment of Invalidity and Unenforceability<br>of the 2016 Operating Agreement)

85. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 72 above.

86. Plaintiffs seek a declaration that the provisions of the 2016 Operating Agreement, relating to the buy-out of Folkins are unenforceable by virtue of the fact that Folkins bases his withdrawal solely upon the breach of the Distribution Agreement and the Operating Agreements, which are invalid.

87. By reason of the invalidity of the Distribution Agreement and the Operating Agreements the buy-out provision of the Operating Agreement is invalid and may not be enforced.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment against the Defendants, declaring and ordering as follows:

1. That the Customer and Market Allocation Provisions of the Distribution Agreement, the Operating Agreements, and in any other agreement, if enforced, would constitute an illegal restraint of interstate trade and commerce in violation

of Section 1 of the Sherman Act, 15 U.S.C. §1, and thus are invalid and unenforceable.

2. That the Customer and Market Allocation Provisions of the Distribution Agreement and the Operating Agreements, and in any other agreement, are null and void;

3. Retrospective and prospective enforcement of the Operating and Distribution Agreements' Customer and Market Allocation Provisions be permanently enjoined and declared and judged to violate Section 1 of the Sherman Act, 15 U.S.C. §1, as well as invalid, unenforceable, and void as against public policy.

4. That Defendants, their officers, directors, agents, employees, and successors and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, and in any manner, directly or indirectly, seeking to enforce the Customer and Market Allocation Provisions of the Distribution Agreement the Operating Agreements, or in any other agreement in connection with the manufacture and sale of mattresses and bedding products.

5. A declaration that any provision for the purchase of a withdrawing member under the Operating Agreement based upon the violation of the agreements declared to be unlawful is itself unlawful, void and unenforceable

6. Plaintiffs be awarded costs of this action and attorneys' fees;

7. Such other and further relief as the Court deems just and appropriate.

Dated: May 24, 2021

THOMAS & THOMAS

_W. Neil Thomas, III_  BPR#4536
6148 Lee Highway, Suite 115
Chattanooga, TN 37421

Attorneys for China Beds Direct, LLC

_Robin Ruben Flores, Esq._ BPR#20751 w/permission
4110-A Brainerd Road
Chattanooga, TN 37411

Attorney for Healthcare Group (Hong Kong) Ltd.

Of Counsel:

Philip Lomonaco, Esq. BPR#11579
800 South Gay Street, Suite 1950
Knoxville, TN 37929

Attorney for Healthcare Company Ltd.